O

# United States District Court
# Central District of California

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>SAMUEL BRASLAU, RAND J. CHORTKOFF, and STUART E. RAWITT,<br><br>　　　　　　Defendants. | Case № 2:14-cv-01290-ODW(AJWx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT STUART E. RAWITT [36]** |

## I.　INTRODUCTION

Samuel Braslau, Rand J. Chortkoff, and Stuart E. Rawitt fraudulently offered and sold securities to investors who were told their money would finance a multi-million dollar movie starring A-list celebrities that was "sure" to generate significant returns. (Compl. ¶ 1.)　The movie was never made and, considering the large percentage of investor proceeds earmarked for purposes unrelated to making the movie, likely never could have been made. (*Id*.)　The Securities Exchange Commission ("SEC") filed suit against Braslau, Chortkoff, and Rawitt for multiple violations of the Securities Act and the Securities Exchange Act. (ECF No. 1.)　When

Rawitt failed to respond to the Complaint, default was entered and the SEC moved for entry of default judgment. (ECF No. 36.) For the reasons discussed below, the Court **GRANTS** the SEC's Motion.[1] (*Id*.)

## II. FACTUAL ALLEGATIONS

*1. Formation of the Fraud*

In 2010, Braslau and Chortkoff discussed acquiring several million dollars purportedly to finance the production of a movie. (Compl. ¶ 19.) In December 2010, Braslau formed Mutual Entertainment, LLC—a company that offered and sold securities in the form of "membership units" investors purchased ostensibly to finance the movie. (*Id*. ¶ 20.)

An unemployed actor was named the managing member of Mutual Entertainment, but Braslau exercised *de facto* control over the company, its finances, and operations. (*Id*. ¶ 21.) The actor-managing member and Braslau shared signature authority over Mutual Entertainment's bank accounts, but Braslau transacted all the activity and did not share records of his transactions. (*Id*. ¶ 22.)

In January 2011, Mutual Entertainment contracted with a film director to purchase the rights to an unpublished story titled *Marcel*, later retitled *The Smuggler*, for "$25,000 or 1% of the final going in budget, whichever amount is greater." (*Id*. ¶ 23.) Film Shoot, LLC paid $25,000 to Jasmine Pictures pursuant to this agreement. (*Id*.) An unemployed musician was named the managing member of Film Shoot, but Braslau exercised *de facto* control over the company, its finances, and operations. (*Id*. ¶ 42.) The musician-managing member and Braslau shared signature authority over Film Shoot's bank accounts, but Braslau transacted all the activity and did not share records of his transactions. (*Id*.)

Mutual Entertainment contracted with the same director to direct the movie and agreed to finance the estimated $3.5 million budget. (*Id*. ¶ 24.) The director was

---

[1] After carefully considering the papers filed concerning the Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

never used or paid. (*Id.*)

In February 2011, Mutual Entertainment contracted with Film Vergnuegen, Inc. to secure a producer. (*Id.* ¶ 25.) The producer was never used and was paid $75,000. (*Id.*)

In March 2011, Mutual Entertainment began offering and selling up to $7.5 million of securities in the form of membership units at $1 per unit with a $25,000 required minimum. (*Id.* ¶ 27.) The company reserved, and exercised, the right to accept investments less than $25,000. (*Id.*)

### 2. *Execution of the Fraud*

Mutual Entertainment obtained investors through Mutual Entertainment Ventures, Inc. ("MEV") and Chortkoff. (*Id.* ¶ 28.) MEV and Chortkoff hired "fronters" to cold call potential investors from lead lists that MEV and Chortkoff purchased. (*Id.*) Braslau and Chortkoff created a script that fronters used to solicit potential investors. (*Id.* ¶ 29.) Per the script, fronters asked whether the person was a qualified investor and, if so, whether the person wanted to opt in and hear more about an "opportunity to get in with a production company seeking qualified investors." (*Id.*)

Once the self-accredited potential investor opted in, fronters explained that Mutual Entertainment was looking for people to invest in "the kind of project that only comes around once in a great while." (*Id.* ¶ 31.) Fronters said the movie would be directed and produced by professionals with previous commercial success. (*Id.*) Fronters provided a website with the movie's "proposed" A-list cast and asked whether the person was interested in hearing more about the investment opportunity from a "Production Executive." (*Id.*)

Once the self-accredited potential investor expressed continued interest, the fronter provided the person's information to Chortkoff, and Chortkoff provided the information to a "closer." (*Id.* ¶ 32.)

///

Chortkoff oversaw the mailing of written offering materials to potential investors. (*Id.* ¶ 34.) Among other materials, he supplied a glossy brochure that included biographical sketches of the director and producer, a "proposed" A-list cast, and budget and revenue figures for "comparable" movies. (*Id.*) The named director and producer never provided any services. (*Id.* ¶¶ 24–25.) The proposed A-list cast members were never contacted about appearing in the movie. (*Id.* ¶ 36.) And the movies advertised as comparable were actually filmed and released. (*Id.* ¶ 35.)

From April 2011 through August 2013, Braslau, Chortkoff, and salespeople raised over $1.8 million from at least 60 investors nationwide. (*Id.* ¶ 5.) Braslau drafted and Chortkoff distributed memoranda to investors that affirmatively misrepresented or failed to disclose material facts, including the rates of commissions paid to salespeople. (*Id.* ¶ 44.) Almost all investor money was diverted to the Defendants and their associates, often as sales commissions or consulting fees, or to facilitate the offering. (*Id.* ¶ 7.)

  *3. Rawitt's Role*

Chortkoff hired Rawitt as a "closer." (*Id.* ¶ 57.) Rawitt received a commission of 27% of the amount invested by any person that Rawitt closed by himself and 10 to 15% of the amount invested by any person that Rawitt closed with the assistance of others. (*Id.*) Through his involvement, Rawitt acted as a broker and dealer; however, he was not registered with the SEC. (*Id.* ¶ 10.)

On July 15, 2010, Rawitt entered into a consent judgment permanently barring him from violating Sections 5(a) and 5(c) of the Securities Act and Section 15(a) of the Securities Exchange Act. *See SEC v. Rockwell Energy of Texas, LLC, et al.*, 4:09-cv-4080 (S.D. Texas). (Id. ¶ 15.) During his involvement with Braslau and Chortkoff, Rawitt was subject to the SEC Order. (*Id.* ¶ 11.)

  *4. The Civil Action*

On February 20, 2014 the SEC filed this action against Defendants for multiple violations of the Securities Act and the Securities Exchange Act. (ECF No. 1)

Discovery was stayed pending completion of a parallel criminal case against Defendants. (ECF No. 14.) On August 27, 2014, the SEC's process server personally served Rawitt with the Summons and Complaint. (ECF No. 22.) When Rawitt failed to answer or otherwise respond, the Clerk of Court entered default. (*Id.*) On October 9, 2014, the SEC moved for default judgment. Because Rawitt has not appeared or retained counsel in this action, the SEC served the instant Motion on Rawitt's criminal defense attorney by U.S. mail and email. (Greco Decl. ¶ 9.) Rawitt has not filed an opposition.

5. *The Criminal Action and Rawitt's Guilty Plea*

On October 24, 2014, Rawitt entered a plea agreement with the United States Attorney's Office in *United States v. Samuel Braslau, et al.*, 2:14-cr-44-RGK (C.D. Cal.). (Greco Decl. ¶ 3, Ex. 1.) He pleaded guilty to mail fraud in violation of 18 U.S.C. § 1341. (*Id.*) In the civil action, the SEC alleges that Rawitt made numerous false and misleading statements to potential investors. (Compl. ¶¶ 85–95.) In the criminal action, he said, "[a]lthough I do not recall each and every statement, I do admit making many, if not most, of them to prospective investors." (Rawitt Decl. ¶ 13.) In the civil action, the SEC alleges that Rawitt "knew or was reckless in not knowing" that his representations were false. (Compl. ¶ 98.) In the criminal action, he said that he did not know his statements were false but admitted that he "chose not to know and did not question [co-defendants Braslau and Chortkoff] as to the basis for any such statement" and agreed that "at the very minimum [his] lack of knowledge, therefore, was 'reckless.'" (Rawitt Decl. ¶ 16.)

6. *Judgment Sought*

The SEC alleges four claims against Rawitt: (i) fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act; (ii) fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5; (iii) acting as an unregistered broker or dealer, in violation of Section 15(a)(1) of the Securities Exchange Act; and (iv) associating with a broker or

dealer in contravention of a prior SEC bar order, in violation of Section 15(b)(6)(B)(i) of the Securities Exchange Act. (*Id*. ¶¶ 104 –115.)

The SEC seeks a permanent injunction barring Rawitt from future violations of the Securities Act and the Securities Exchange Act. (Mot. 2.) The SEC also seeks an order that Rawitt is subject to disgorgement of all ill-gotten gains, prejudgment interest and the imposition of a civil penalty, but will later seek a final judgment setting forth specific monetary relief. (*Id*.)

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk enters default under Rule 55(a). Local Rule 55-1 requires that the movant submit a declaration establishing (1) when and against which party default was entered; (2) identification of the pleading to which default was entered; (3) whether the defaulting party is a minor, incompetent person, or active service member; and (4) that the defaulting party was properly served with notice.

A district court has discretion whether to enter default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Upon default, the defendant's liability generally is conclusively established, and the well-pleaded factual allegations in the complaint are accepted as true. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–19 (9th Cir. 1987) (per curiam) (citing *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).

In exercising its discretion, a court must consider several factors, including (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether the defendant's default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

/ / /

Upon proper showing, a permanent injunction shall be granted in enforcement actions brought by the SEC pursuant to Section 20(b) of the Securities Act and Section 21(d) of the Securities Exchange Act. *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). That burden is met when the evidence establishes a reasonable likelihood of a future violation of the securities laws. *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978). The factors to be considered include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. *See id.*

## IV. DISCUSSION

### A. Notice

On August 27, 2014, the SEC's process server personally served Rawitt with the Summons and Complaint. (ECF No. 22.) Therefore, the Court finds that the SEC properly served Rawitt in compliance with Federal Rule of Civil Procedure 4(e)(2)(A).

### B. *Eitel* Factors

The Court finds that the *Eitel* factors weigh in favor of default judgment.

*1. The SEC Would Suffer Prejudice*

If the Court does not grant default judgment, the case will be at a standstill. Rawitt has had ample opportunity to participate in the adjudicatory process and help the Court resolve this matter.

*2. The SEC Has Brought Meritorious Claims*

The SEC's allegations establish that Rawitt violated Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act. Section 17(a) prohibits fraud in the offer and sale of securities. Similarly, Section 10(b) and Rule 10b-5 prohibit fraud in connection with the purchase or sale of any security. A party violates these anti-fraud provisions by making false or misleading representations that

concern material facts. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

In his criminal guilty plea, Rawitt substantiated the SEC's civil allegations by admitting that he recklessly made false and material misrepresentations to potential investors. (Rawitt Decl. ¶¶ 13, 16.) Therefore, he violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Securities Exchange Act.

The SEC's allegations establish that Rawitt violated Section 15(a)(1) of the Securities Exchange Act, which requires that anyone who effects a transaction to induce the purchase or sale of any security be registered with the SEC.

Rawitt acted as a broker in connection with co-Defendants' securities offerings. He directly solicited potential investors and raised substantial amounts of money. He received transaction-based compensation, earning 27% of the amount invested by any person he closed by himself and 10 to 15% of the amount invested by any person he closed with the assistance of others. Rawitt was not registered as a broker or dealer when he sold securities. Therefore, he violated Section 15(a)(1) of the Securities Exchange Act.

The SEC's allegations establish that Rawitt violated Section 15(b)(6)(B)(i) of the Securities Exchange Act, which prohibits any person from associating with a broker or dealer in contravention of a prior SEC bar order. Through his involvement with Braslau and Chortkoff, Rawitt violated the October 27, 2010 Order instituted by the SEC. Therefore, he violated Section 15(b)(6)(B)(i).

The SEC has pleaded actionable Securities Act and Securities Exchange Act claims against Rawitt.

   3.   *The Amount at Stake Weighs in Favor of Default Judgment*

The SEC seeks a Court order that Rawitt be subject to disgorgement, prejudgment interest and the imposition of a civil penalty, but does not currently seek any specific amount for monetary relief. Therefore, there is no amount at stake in this Motion and this factor does not apply.

### 4. *There is Little Possibility of Dispute as to Material Facts*

The statements that Rawitt made in his criminal guilty plea substantiate the SEC's civil allegations and therefore leave little possibility of a dispute as to material facts.

### 5. *There is Little Possibility Default was Due to Excusable Neglect*

The SEC's process server personally served Rawitt with the Summons and Complaint and Rawitt did not answer or otherwise respond. The SEC then filed the instant Motion and served Rawitt's criminal defense attorney by U.S. mail and email. Rawitt has not filed an opposition. This leaves little possibility that default was due to excusable neglect.

### 6. *Policy for Deciding on the Merits Weighs in Favor of Granting Default Judgment*

Although Rawitt did not respond to the Complaint, his admissions in his guilty plea in the criminal case substantiate the SEC's civil allegations. The Court finds that this factor does not preclude entry of default judgment.

## C. Permanent Injunction

The factors established for imposing injunctive relief weigh heavily in favor of granting a permanent injunction. Rawitt's violations were continued and egregious. Repeatedly, Rawitt made false and misleading representations to potential investors that were designed to convince them to invest so that he could earn substantial and undisclosed sales commissions drawn from their investment. He did so with full knowledge that no movie had been made or likely could ever be made.

## V. CONCLUSION

The Court **ORDERS that Rawitt be permanently enjoined** from future violations of**:** (i) Section 17(a) of the Securities Act; (ii) Section 10(b) of the Exchange Act and Rule 10b-5; (iii) Section 15(a)(1) of the Securities Exchange Act; and (iv) Section 15(b)(6)(B)(i) of the Securities Exchange Act. The Court also **ORDERS that Rawitt pay disgorgement, prejudgment interest and a civil penalty**

in amounts to be determined at a later date upon noticed motion. For the reasons discussed above, the Court **GRANTS** the SEC's Motion for Default Judgment. (ECF No. 36.)

**IT IS SO ORDERED.**

November 17, 2014

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**